UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JULIE ANNE CARD,<br><br>      Plaintiff,<br><br>  v.<br><br>CAROLYN COLVIN, Commissioner of Social Security,<br><br>      Defendant. | Case No. C13-1200-MJP-BAT<br><br>**REPORT AND RECOMMENDATION** |

Julie Anne Card seeks review of the denial of her Supplemental Security Income and Disability Insurance Benefits applications. She contends the ALJ erred by (1) erroneously denying her request to subpoena a consultative examiner; (2) failing to further develop the record (3) discounting her credibility; (4) improperly assessing the medical evidence related to her left-hand impairments; (5) improperly assessed the medical opinion of Janine Shaw, M.D.; and (6) finding at step five that she could perform other jobs. Dkt. 14. As discussed below, the Court recommends the Commissioner's decision should be **REVERSED** and **REMANDED** for additional administrative proceedings.

**BACKGROUND**

Ms. Card is currently 43 years old, completed the ninth grade, and has worked as a car

REPORT AND RECOMMENDATION - 1

washer, housekeeper/janitor, newspaper deliverer, parts cutter/pallet loader, and upholsterer.[1]
On February 18, 2010, she applied for benefits, alleging disability as of May 1, 2008. Tr. 224-29. Her applications were denied initially and on reconsideration. Tr. 126-29, 138-49. The ALJ conducted hearings on November 16, 2011 (Tr. 63-106), and April 26, 2012 (Tr. 107-20), and subsequently found Ms. Card not disabled. Tr. 32-62. As the Appeals Council denied Ms. Card's request for review, the ALJ's decision is the Commissioner's final decision. Tr. 1-7.

## THE ALJ'S DECISION

Utilizing the five-step disability evaluation process,[2] the ALJ found:

**Step one:** Ms. Card has not engaged in substantial gainful activity since May 1, 2008.

**Step two:** Ms. Card's callus formation of the bilateral feet; lower back pain; left knee pain; right shoulder weakness; insomnia; major depressive disorder; anxiety disorder, personality disorder not otherwise specified; and gender identity disorder are severe.

**Step three:** These impairments did not meet or equal the requirements of a listed impairment.[3]

**Residual Functional Capacity ("RFC"):** Ms. Card can lift up to 20 pounds occasionally and lift and/or carry up to 10 pounds frequently; stand and/or walk about 2 hours during an 8-hour workday, with normal breaks; and sit about 6 hours during an 8-hour workday, with normal breaks. She is limited to occasional overhead reaching with the right upper extremity. She can occasionally climb ramps, stairs, balance, stoop, kneel, and crouch. She can never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to extreme temperatures of cold and heat, vibrations, industrial-types of fumes and odors, and hazards such as unprotected heights. She can perform simple, routine tasks and follow short, simple instructions. She can perform simple duties that can be learned on-the-job in a short period. She will have the average ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis within customary tolerances of employers' rules regarding sick leave and absences. She can have occasional interactions of a superficial nature with coworkers and supervisors and can work in proximity to coworkers but not in a cooperative or team effort. She can deal with occasional work setting changes. She cannot deal with the general public as in a sales position or where the general public is frequently encountered as an essential element of the work process. Incidental contact of

---

[1] Tr. 224, 250-51.
[2] 20 C.F.R. §§ 404.1520, 416.920.
[3] 20 C.F.R. Part 404, Subpart P, Appendix 1.

REPORT AND RECOMMENDATION - 2

a superficial nature with the general public is not precluded.

**Step four:**  Ms. Card cannot perform her past work.

**Step five:**  As there are other jobs that exist in significant numbers in the national economy that Ms. Card can perform, she is not disabled.

Tr. 35-55.

## DISCUSSION

**A.     Procedural Issues Surrounding the Supplemental Hearing[4]**

At the close of the first administrative hearing, which was held in Bellingham, the ALJ indicated that he planned to request that Ms. Card attend a consultative physical examination. Tr. 104-06.  That same day, Ms. Card's attorney wrote a letter to the ALJ, specifically requesting that he also order x-rays and an MRI of Ms. Card's knees to be reviewed by the consultative

---

[4] The organization of Ms. Card's briefing obscures her intent as to some of her assignments of error.  Ms. Card lists as her third assignment of error "the ALJ's failure to have the consultative examiner, Dr. Bunnell[,] present at the supplemental hearing for examination on the substance and basis for opinions and examination on the favorable objective findings in his report" (Dkt. 14 at 1), but there is no corresponding section of her brief that addresses this assignment of error.  She includes only one sentence that arguably touches on this assignment of error in a section of her brief addressing her assignment of error related to her left-hand impairment:

> The admission to the record of Dr. Bunnell's January 2012 consultative examination was contested by Plaintiff, because the ALJ failed to call Dr. Bunnell to testify at the supplemental hearing, where Plaintiff would have sought to elicit testimony such as to why the doctor found she has no manipulative or handling limitations, despite objective findings of left finger limitation; and Plaintiff raised the issue and maintains that the ALJ's failure to request Dr. Bunnell voluntarily appear to testify, and/or failure to subpoena the doctor to the supplemental hearing is error which denied Plaintiff a full and fair hearing.

Dkt. 14 at 15 (citations omitted).  The Court also notes that Ms. Card's opening brief skips from a section numbered "2" (addressing the assignment of error listed second) to a section numbered "4" (addressing the assignment of error listed fourth).  Dkt. 14 at 10, 17.  Ms. Card addressed the alleged procedural errors in greater detail in her reply brief (Dkt. 18 at 5-10), but these arguments will not be considered because they were addressed for the first time on reply.  *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8 (9th Cir. 2009) ("[A]rguments not raised by a party in an opening brief are waived.").

REPORT AND RECOMMENDATION - 3

examiner. Tr. 332-33. He additionally requested that the ALJ send Ms. Card for a consultative psychological evaluation. *Id.*

Ms. Card was examined by Aaron Bunnell, M.D., in January 2012, and a copy of his report was sent to Ms. Card's attorney, along with a notice regarding Ms. Card's rights with respect to that additional evidence. Tr. 334-35. The notice indicated that Ms. Card could submit written comments regarding Dr. Bunnell's report or submit questions to be submitted to Dr. Bunnell, or could request a supplemental hearing "at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law." Tr. 334. The notice also informed Ms. Card that she could request an opportunity to question Dr. Bunnell about his report. *Id.*

Ms. Card responded via counsel to the ALJ's proffer letter and notice in writing, indicating that she renewed her request for an MRI of her knee (with a supplemental physical evaluation in light of those results) and a psychological evaluation, and also requested a supplemental hearing to question Dr. Bunnell. Tr. 337-38. Ms. Card specifically requested that the ALJ construe her letter as a request to subpoena Dr. Bunnell. Tr. 338.

The ALJ denied Ms. Card's request for additional physical and psychological evaluations, and asked whether she still requested a supplemental hearing. Tr. 341. Ms. Card responded to this denial to renew her request for a supplemental hearing, and set forth general questions she would ask Dr. Bunnell at that hearing. Tr. 339-40. The ALJ scheduled Ms. Card's supplemental hearing to be conducted via telephone, and she objected to that arrangement, noting that she did not waive her right to an in-person hearing in Bellingham. Tr. 342. The ALJ thereafter indicated that Ms. Card's hearing would be held in Seattle; Ms. Card first assented to this location (Tr. 218), and then subsequently informed the ALJ that her impairments prevented

REPORT AND RECOMMENDATION - 4

her from traveling to Seattle. Tr. 345. Ms. Card suggested that the supplemental hearing could be set for Bellingham, but was informed that the ALJ's schedule could not accommodate this request without significant delay, which the ALJ was unwilling to allow. Tr. 345. The ALJ then excused Ms. Card from attending the supplemental hearing, and provided that she could participate via telephone if desired. Tr. 223. Ms. Card again objected to this procedure, arguing that she was entitled to an in-person hearing in Bellingham. Tr. 358. On the day before the scheduled supplemental hearing, the ALJ informed Ms. Card that her request to subpoena Dr. Bunnell was denied. Tr. 125. Ms. Card then further objected to the ALJ's holding a supplemental hearing in Seattle, without the benefit of Dr. Bunnell's testimony. Tr. 359-60.

The ALJ nonetheless conducted the supplemental hearing in Seattle, without Ms. Card or Dr. Bunnell present. Tr. 107-20. Ms. Card's attorney objected to including Dr. Bunnell's report in the record, and the ALJ indicated that he would address that objection in his written decision. Tr. 109-10. Ms. Card's attorney also again objected to the hearing location. Tr. 116-17.

In the ALJ's written decision, he explained why he overruled Ms. Card's objection to the location of the supplemental hearing. Tr. 35-36. He also further elaborated on why he denied Ms. Card's request to subpoena Dr. Bunnell, and why he denied her request to strike Dr. Bunnell's report. Tr. 36-37.

Ms. Card argues summarily that the ALJ's refusal to either request that Dr. Bunnell voluntarily attend the supplemental hearing, or to grant her request to issue a subpoena to secure Dr. Bunnell's attendance, denied her right to a full and fair hearing. Dkt. 14 at 15. She cites no authority supporting this argument. *Id*. The Commissioner suggests that the ALJ's denial of Ms. Card's subpoena request complies with the regulatory requirements, because the subpoena

request did not indicate the "important facts" Dr. Bunnell's testimony would prove[5] and why the facts could not be proved without a subpoena. *See* 20 C.F.R. §§ 404.950(d)(2), 416.1450(d)(2). A review of the procedures set forth in the Commissioner's internal manual, Hearings, Appeals and Litigation Law Manual ("HALLEX"), does not suggest that the ALJ abused his discretion in denying Ms. Card's request for a subpoena. *See* HALLEX I-2-5-78, *available at* http://ssa.gov/OP_Home/hallex/I-02/I-2-5-78.html (last accessed Feb. 7, 2014).

Ms. Card also briefly addresses whether the ALJ erred in failing to obtain additional testing on her knees requested in post-hearing correspondence. Dkt. 14 at 17. Although Ms. Card argues that the additional testing "could have provided the objective evidence that the ALJ faulted [her] for lacking", the ALJ did not in fact suggest that Ms. Card's knee symptoms were uncorroborated. Instead, he found that Ms. Card's allegations of knee limitations were inconsistent with her "intact sensory and motor function in the lower extremities, with no signs of instability in the knee[,]" as well as normal x-rays. Tr. 50. The ALJ also noted that Ms. Card herself reported the ability to walk up to half a mile "without much difficulty." Tr. 509. These findings do not suggest that the ALJ found the evidence to be ambiguous or insufficient, and thus his duty to develop the record was not triggered. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) ("An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."). As the ALJ further noted, none of Ms. Card's treating sources ordered an MRI or sunrise x-ray, and the ALJ kept the record open after the first administrative hearing to allow Ms. Card to submit additional records. Tr. 38. Under these circumstances, Ms. Card has not shown

---

[5] Although Ms. Card suggests that if Dr. Bunnell had testified at the supplemental hearing, she would have asked him why he found "no manipulative or handling limitations, despite objective findings of left finger limitations" (Dkt. 15 at 15), this line of questioning was not suggested in her subpoena request. Tr. 339-40.

REPORT AND RECOMMENDATION - 6

that the ALJ erred in denying her requests for additional testing.

**B.     Credibility**

The ALJ provided a number of reasons to discount Ms. Card's credibility: (1) lack of corroboration and inconsistency with the medical record, (2) her use of a cane without a prescription, (3) conservative treatment, (4) self-reported abilities and activities inconsistent with allegations, and (5) improvement of feet and right shoulder problems.  Tr. 47-48.  Ms. Card argues that the ALJ erred as to the first three reasons, but does not challenge the other reasons. Dkt. 14 at 18-20.  Ms. Card's failure to challenge all of the reasons provided by the ALJ for discounting her credibility renders any errors at most harmless.  *See Carmickle v. Comm'r of Social Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008).

But even the challenged reasons are not erroneous.  Ms. Card contends that the ALJ erred in looking to the medical evidence to determine whether her allegations were corroborated because "objective evidence cannot be required to prove the amount of pain one experiences." Dkt. 14 at 18.  While it is true that a lack of corroborating medical evidence cannot *alone* support an adverse credibility determination, "the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 855 (9th Cir. 2001).  The ALJ did not err in discussing the medical evidence regarding Ms. Card's left knee in determining whether it supported her allegations of disabling pain.

To the extent Ms. Card challenges the ALJ's reasoning that the fact that she had worked in the past despite her knee impairment undermined the credibility of her allegations, because her knee problems were exacerbated after a fall in 2008, she has not shown that the ALJ erred in considering post-fall evidence, such as normal x-rays in January 2010, and lack of instability or

significant motor weakness in treatment notes dating to 2009, 2010, and 2012. Tr. 47. The ALJ also noted that Ms. Card used only over-the-counter pain relievers to treat her knee pain,[6] and that she reported being able to walk half a mile without difficulty in May 2010. *Id*. Although Ms. Card contends that her knee pain was disabling after her 2008 fall, she has not shown that the ALJ unreasonably interpreted the post-2008 evidence of record to conclude otherwise.

Furthermore, an ALJ properly considers whether a claimant's use of an assistive device is consistent with the medical evidence when assessing the claimant's credibility. *See, e.g.*, *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999) (affirming an ALJ's finding that a claimant's use of cane undermined the credibility of his allegations, because no doctor had recommended the use of a cane and two doctors had specifically indicated that he did not need to use a cane). Ms. Card had reported that she needed to use her cane every day (Tr. 280), and the ALJ did not err in noting that the record contained no cane prescription. Tr. 47. As Ms. Card herself notes in her opening brief, the record contains evidence that her treating physician recommended that she not use her cane "too much" to avoid stance problems. Dkt. 14 at 20 (citing Tr. 79).

For these reasons, Ms. Card has not shown that the ALJ erred in considering medical evidence when assessing her credibility.

---

[6] Ms. Card notes that the medical record shows that on one occasion she used prescription medication Lyrica, and argues that this contradicts the ALJ's finding that she used only over-the-counter medication to treat her knee pain. Dkt. 14 at 16. "Lyrica" is listed under the section of a treatment note entitled "Impression and Recommendations," but is not included in a list of medications. Tr. 571-72. Earlier in the treatment note, the provider noted that Lyrica was "ineffective." Tr. 570. This ambiguous reference to Lyrica does not establish that the ALJ erred in finding that Ms. Card's knee pain was not treated with prescription medication.

The ALJ did mischaracterize the record, however, when he found that Ms. Card had received no injections for her knee. Tr. 47. She did receive one injection in May 2010. Tr. 568-69. This error is harmless in light of the ALJ's other reasons to discount Ms. Card's credibility, some of which are unchallenged. *See Carmickle*, 533 F.3d at 1162-63.

REPORT AND RECOMMENDATION - 8

C. **Left-Hand Impairment**

Dr. Bunnell noted that Ms. Card's fifth finger on her left hand was scarred and deformed due to a prior amputation and reattachment. Tr. 833. Dr. Bunnell did not list any left-hand impairment in his list of diagnoses, and he also indicated that Ms. Card had no manipulation limitations. Tr. 834. Despite this lack of diagnosis, Ms. Card argues that the ALJ should have included a left-hand limitation at step two, in light of Dr. Bunnell's findings that her left fifth finger had a decreased range of motion and her own testimony and lay witness testimony describing hand limitations. Dkt. 14 at 11.

Ms. Card's arguments are not persuasive. She cites no medical evidence of record establishing that she has a left-hand impairment. Dr. Bunnell and consultative examiner Gary Gaffield, D.O., noted her previous hand surgery, but both doctors found that this previous surgery did not cause any manipulative limitations. Tr. 510, 514, 834. The lack of medical evidence supporting the existence of a left-hand impairment is fatal to Ms. Card's argument that the ALJ should have included a left-hand impairment at step two. *See* 20 C.F.R. §§ 404.1508, 416.908.

Although Ms. Card and lay witness Nancy Hendler described left-hand limitations, the ALJ explained why he discounted Ms. Card's credibility (as discussed in the previous section) and why he rejected Ms. Hendler's statement regarding left-hand limitations. Tr. 49 (explaining that Ms. Hendler's statements were undermined by the lack of evidence that Ms. Card complained of or received treatment for any "left hand problems," as well as the testing showing intact sensation in Ms. Card's upper extremities). Ms. Card has not shown that the ALJ erred in discounting either her own testimony or Ms. Hendler's statement, and thus has not established that the ALJ erred in failing to accommodate the limitations they described.

REPORT AND RECOMMENDATION - 9

**D.     Dr. Shaw's Opinions[7]**

Ms. Card alleges that the ALJ erred in rejecting a January 2011 opinion of her treating physician, Dr. Shaw, that she cannot sit for more than four hours in an eight-hour workday. *See* Tr. 599-600. Dr. Shaw's opinion was contradicted by her earlier August 2010 opinion that Ms. Card *could* perform sedentary work, despite sitting restrictions. Tr. 580-85.

The ALJ gave partial weight to Dr. Shaw's August 2010 opinion, but rejected the sitting restrictions in light of a July 2011 MRI showing "no neurological compromise at any lumbar level," and due to the fact that Ms. Card herself did not allege difficulty with sitting. Tr. 50. The ALJ gave no weight to Dr. Shaw's January 2011 opinion regarding sitting and standing limitation due to lack of support in the medical record showing that Ms. Card's condition worsened between August 2010 and January 2011, and due to Dr. Shaw's assumption that Ms. Card had a severe back disorder and left-sided sciatica (which, the ALJ found, was contradicted by x-rays and an MRI obtained later in 2011). Tr. 50-51.

Ms. Card offers an alternate interpretation of the evidence, focusing on Dr. Shaw's findings related to left-sided weakness, decreasing range of motion, and left knee pain as corroborating her opinions regarding Ms. Card's sitting and standing limitations. Dkt. 14 at 14. Dr. Shaw did not cite left-sided weakness or range-of-motion concerns, however, as the cause of Ms. Card's limitations; she cited left knee pain and left-sided sciatica (Tr. 582), and the ALJ explained why he discounted Ms. Card's allegations of left knee pain and why the left-sided sciatica diagnosis was inconsistent with Ms. Card's subsequent MRI. Tr. 50. The ALJ also cited to Ms. Card's self-reported lack of difficulty with sitting and her ability to walk half a mile

---

[7] Although the Commissioner defends the ALJ's rejection of Dr. Shaw's lifting/carrying restrictions (Dkt. 15 at 8-9), but Ms. Card's opening brief does not specifically assign error to the ALJ's rejection of those limitations. Dkt. 14 at 13-15.

REPORT AND RECOMMENDATION - 10

without much difficulty as undermining Dr. Shaw's opinions, and Ms. Card has not shown that the ALJ erred in that interpretation. Accordingly, Ms. Card has not established that the ALJ's reasons to discount Dr. Shaw's opinions are not legitimate.

Ms. Card goes on to argue that the ALJ erred in relying on Dr. Bunnell's report interpreting the medical evidence in finding that Dr. Shaw's opinions were contradicted by the record, given that he had indicated that he would not rely on Dr. Bunnell's report when assessing her RFC. *See* Tr. 37. The ALJ's decision states that he gave "little to no weight" to Dr. Bunnell's opinion that Ms. Card has no limitations in her ability to lift, carry, stand, walk, or sit (Tr. 51), but the ALJ did refer to some of Dr. Bunnell's clinical findings and Ms. Card's report to Dr. Bunnell as evidence (along with other evidence) contradicting other medical opinions. *See* Tr. 47-50. The ALJ's decision is not internally inconsistent on this point; he stated that he would not rely on Dr. Bunnell's report when assessing Ms. Card's RFC, and he indeed rejected Dr. Bunnell's opinions and found Ms. Card to be more limited than Dr. Bunnell did. The ALJ's references to Dr. Bunnell's findings, while rejecting his conclusions, does not establish that Dr. Bunnell's report was "crucial" to the ALJ's decision. *See* Tr. 37 (citing *Solis v. Schweiker*, 719 F.2d 301, 302 (9th Cir. 1983) (finding that an ALJ abused his discretion in denying a claimant's request to subpoena a consultative examiner because the examiner's report was "crucial" to the ALJ's decision)).

**E.    Step-Five Findings**

At the first administrative hearing, the ALJ posed the following hypothetical to the vocational expert ("VE"):

> Assume an individual of the Claimant's age, education, and work experience. Could lift up to 20 pounds occasionally, lift and carry up to 10 pounds frequently. Standing and/or walking with normal breaks about two hours in an eight hour workday, sitting with normal breaks about six hours in an eight hour workday.

REPORT AND RECOMMENDATION - 11

> In the upper extremities, limited to occasional overhead reaching with the right upper extremity. Individual could occasionally climb ramps or stairs, balance, stoop, kneel, crouch. No ladders, ropes, or scaffolds, and no crawling. The individual would avoid concentrated exposure to temperature extremes, cold and heat, vibrations, industrial types of fumes and odors, hazards such as unenclosed and unprotected heights. . . .

Tr. 101-02. The VE testified that this hypothetical individual would not be able to perform any of Ms. Card's prior jobs, but could perform the sedentary jobs of plastic computer board inspector and stuffer of toy and sports equipment. Tr. 103. The VE also testified that the hypothetical individual could perform the light job of injection molding machine tender; the VE testified that although this is a light job, he has "observed that a stool is provided." *Id.* The ALJ did not ask the VE whether his testimony was consistent with the Dictionary of Occupational Titles ("DOT").

Ms. Card argues that the ALJ erred in relying on the VE's testimony about the injection molding machine tender job, because his testimony that a stool is provided is not consistent with the DOT and the ALJ did not ask the VE to explain the basis for that deviation. *See Massachi v. Astrue*, 486 F.3d 1149, 1152-54 (9th Cir. 2007) (holding that an ALJ has an affirmative responsibility to inquire as to whether a VE's testimony is consistent with the DOT and, if there is a conflict, determine whether the VE's explanation for such a conflict is reasonable). Here, the ALJ did not explicitly ask the VE to elaborate on the basis for his testimony, but inferred from his testimony that it was based on his "professional knowledge, skill, experience, training, expertise, and education." Tr. 55. The support for that finding is thin at best, but as the Commissioner notes, any error related to this job is rendered harmless because the VE also identified two sedentary jobs that exist in significant numbers that could independently support the ALJ's step-five finding. Dkt. 15 at 14.

REPORT AND RECOMMENDATION - 12

But Ms. Card challenges the ALJ's reliance on those two sedentary jobs, because both require constant or frequent reaching, and the ALJ's hypothetical included a limitation to occasional overhead reaching with her right arm. *See* Tr. 102; DOT 726.684-050, 731.685-014. The Commissioner argues that because neither job description specifically requires overhead reaching, and instead describe activities involving merely forward reaching, the VE's testimony is consistent with the DOT and thus supports the ALJ's step-five finding. Dkt. 15 at 14-15.

The Court disagrees with the Commissioner, because the DOT does not expressly distinguish between types of reaching and bilateral or one-sided reaching, but instead defines reaching as "extending arm(s) and hand(s) in any direction." *See* Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, App. C. Thus, it is not entirely clear whether a job requiring frequent or constant reaching involves overhead reaching that would be precluded under the ALJ's hypothetical/RFC assessment, and the VE's testimony does not provide clarity on this point. *See Hampton v. Barnhart*, 184 Fed. Appx. 642 (9th Cir. 2006). Because there is at least a potential conflict between the VE's testimony and the DOT, the ALJ's failure to expressly ask the VE whether his testimony was consistent with the DOT is not harmless. On remand, the ALJ shall obtain additional VE testimony to support his step-five findings.

## CONCLUSION

For the foregoing reasons, the Court recommends that the Commissioner's decision should be **REVERSED** and **REMANDED** for additional administrative proceedings. On remand, the ALJ shall obtain additional VE testimony to support his step-five findings.

A proposed order accompanies this Report and Recommendation. Objections, if any, to this Report and Recommendation must be filed and served no later than **February 25, 2014 (14**

REPORT AND RECOMMENDATION - 13

1 **days).** If no objections are filed, the matter will be ready for the Court's consideration on

2 **February 28, 2014**. If objections are filed, any response is due within 14 days after being served

3 with the objections. A party filing an objection must note the matter for the Court's

4 consideration 14 days from the date the objection is filed and served. Objections and responses

5 shall not exceed twelve pages. The failure to timely object may affect the right to appeal.

6     DATED this 11th day of February, 2014.

                            BRIAN A. TSUCHIDA
                            United States Magistrate Judge

REPORT AND RECOMMENDATION - 14